2000-NMCA-015

997 P.2d 142

**STATE of New Mexico,**
**Plaintiff–Appellee,**

v.

**Joseph TRAEGER, Defendant–Appellant.**

No. 19,629.

Court of Appeals of New Mexico.

Jan. 4, 2000.

Certiorari Granted, No. 26,155,
Feb. 22, 2000.

Patricia A. Madrid, Attorney General, Ann M. Harvey, Assistant Attorney General, Santa Fe, for Appellee.

Phyllis Subin, Chief Public Defender, Susan Roth, Assistant Appellate Defender, Santa Fe, for Appellant.

*OPINION*

APODACA, Judge.

{1} Defendant appeals the trial court's judgment and sentence after jury convictions of attempted first-degree murder, aggravated battery with a deadly weapon, criminal sexual penetration in the second degree (CSP II), and false imprisonment. He raises several issues on appeal, including the following three issues discussed in this opinion: (1) the jury instructions on aggravated battery with a deadly weapon were improper; (2) his right to be free from double jeopardy requires the merger of his convictions for at-

tempted first-degree murder, aggravated battery with a deadly weapon, and CSP II because the same injuries were the basis for all three crimes and (3) his conviction of false imprisonment must be set aside because there was no evidence of false imprisonment separate from that inherent in the CSP II charge. We have addressed Defendant's other issues in an unpublished memorandum opinion filed concurrently. We determine that the jury instructions on aggravated battery with a deadly weapon were improper and we therefore reverse and remand on that issue only. Being unpersuaded by Defendant's arguments on all other issues, we affirm on those issues.

## I. FACTUAL BACKGROUND

{2} Defendant and Martha Traeger (Wife) were married but separated at the time the events giving rise to this appeal occurred. Wife testified as follows.

{3} On July 7, 1997, Wife went to Defendant's trailer because he had money for the children. She intended to stay only a short time. She told Defendant she wanted a divorce. Defendant gave Wife an envelope, told her he would walk her out, and walked toward his bedroom, which was next to the front door. Wife opened the front door.

{4} Suddenly, Defendant rushed at Wife, grabbed her, and shut the door. With his hands in black gloves he covered her face, nose, and neck. He pulled her toward the bedroom, then put a string (at times described as a cord) around her neck so that she had great difficulty breathing. He said things like—"Did you really think I was going to let you go? Did you really think you were going to get a divorce? How stupid you are." Wife, afraid she was going to die, tried to put her fingers between the string and her neck in order to breathe.

{5} In the bedroom, Defendant dropped the string. Brandishing a baseball bat, he told Wife to remove her clothes. She urged him to wait and asked if they could talk, but he held the bat with both hands about two feet from her foot and hit it like he was hitting a ball. Her foot immediately began to swell, and she could not walk on it. Defendant yelled at her, called her a liar, and

told her she was not leaving alive. Defendant again told Wife to take off her clothes and threatened that next time he would hit her head with the bat. Wife kept trying to talk to Defendant but he got more upset. He continued to threaten her with the bat, so she took off her clothes.

{6} Wife ended up on the floor. Defendant, still wearing gloves, took hold of her face and neck so she had great difficulty breathing. He told her he wanted to kill her and that she had ruined his life. The more Wife struggled with Defendant, the more he hurt her. Wife told Defendant she did not want to have intercourse, but Defendant forced himself on her, penetrating her vagina with his penis.

{7} Afterwards, Defendant refused to let Wife leave the bedroom for some time. To placate him, she told him the marriage might still work. Eventually she convinced him to take her to the hospital. Wife initially told hospital personnel in front of Defendant that she had dropped a propane tank on her foot, but when Defendant left the room, she told the doctor what had happened to her. Her foot was broken in five places.

{8} The nurse who saw Wife that day testified that Wife had horizontal ligature marks on her neck of the type generally caused by a cord or a rope, vertical marks on her neck that could have been caused by fingernails, and a fresh abrasion on her vagina that could have been caused during sexual intercourse. A police officer trained in wound identification also saw Wife that day. He testified that the horizontal marks on Wife's neck were consistent only with wounds caused by a string or a rope. The vertical scratch marks were consistent with someone trying to pull something away from her neck, "a defensive type of wound."

## II. DISCUSSION

### A. The Jury Instructions on Aggravated Battery With a Deadly Weapon

{9} Defendant argues that his conviction of aggravated battery with a deadly weapon should be reversed because the trial court erred in instructing the jury. We

review jury instructions to determine whether they would have confused or misdirected a reasonable juror. *See State v. Parish*, 118 N.M. 39, 42, 878 P.2d 988, 991 (1994). The challenged instruction stated:

> For you to find the defendant guilty of Aggravated Battery with a Deadly Weapon as charged in Count II, the state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
> 1. The defendant, Joseph Traeger, hit Martha Traeger with a baseball bat, an instrument or object which, when used as a weapon, could cause death or very serious injury;
>
> 2. The defendant, Joseph Traeger, intended to injure Martha Traeger;
>
> 3. This happened in Sandoval County, New Mexico on or about the 6th day of July, 1997.

*See* NMSA 1978, § 30-3-5 (1969) (aggravated battery); UJI 14-322 NMRA 1999 (aggravated battery with a deadly weapon). The jury was also given the following instruction:

### "DEADLY WEAPON"; definition.

> A "deadly weapon" includes bludgeons and any instrument which, when used as a weapon, could cause very serious injury or any weapon which is capable of producing death or great bodily harm.

*See* NMSA 1978, § 30-1-12(B) (1963) (definition of deadly weapon).

{10}   After Defendant was tried in February 1998, we decided *State v. Bonham*, 1998-NMCA-178, 126 N.M. 382, 970 P.2d 154, which addressed a jury instruction on aggravated battery similar to the one quoted above. *Id.* ¶¶ 26-28. The *Bonham* jury instruction required the jury to determine whether the defendant had touched or applied force to the victim "with a hot plate or trivet frame, an instrument or object which, when used as a weapon, could cause death or very serious injury." *Id.* ¶ 26 (emphasis in original omitted). We held that "the grammatical structure of the sentence informed the jury that the hot plate or trivet was a deadly weapon." *Id.* ¶ 27. We found reversible error because the instruction improperly took from the jury the decision whether the

object was a deadly weapon. *Id.* ¶ 28; *accord State v. Montano*, 1999-NMCA-023, ¶¶ 16-18, 126 N.M. 609, 973 P.2d 861 (examining whether brick wall was a deadly weapon).

{11}   The State attempts to distinguish *Bonham* and *Montano* on the ground that the baseball bat is a deadly weapon as a matter of law. As reflected in the jury instruction given in this case, the statutory definition of "deadly weapon" included "bludgeons." *See* § 30-1-12(B). The State argues that a baseball bat is a "bludgeon." A baseball bat is "not specifically listed by statute" as a deadly weapon. *Montano*, 1999-NMCA-023 ¶ 6, 126 N.M. 609, 973 P.2d 861. We believe, however, that by including the term bludgeon in the statutory definition, the Legislature used it in its narrow sense—an instrument made for its intended use as a weapon. A baseball bat, on the other hand, is primarily designed to hit a ball, not to be used as a weapon. This narrow definition or interpretation, we determine, comports to the rationale under *Bonham* and *Montano* that, in this appeal, the question of whether a baseball bat was a deadly weapon should have been left to the jury. We thus conclude that the State's categorization of "bludgeon" is too broad.

### B.   Double Jeopardy

{12}   Defendant argues that his right to be free from double jeopardy was violated by his convictions for attempted first-degree murder, aggravated battery with a deadly weapon, and CSP II, because the State "doublely-used" the same injuries as the basis for all three crimes. The double jeopardy clauses of the United States Constitution, *see* U.S. Const. amend. V, and the New Mexico Constitution, *see* N.M. Const. art. II, § 15, may prohibit punishing a person for violating two different criminal statutes based on the same conduct. *See Swafford v. State*, 112 N.M. 3, 7-15, 810 P.2d 1223, 1227-35 (1991). The issue is one of legislative intent because in this context "the Double Jeopardy clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Id.* at 7, 810 P.2d at 1227 (internal quotation marks and

citation omitted). Our task is to determine "whether the legislature intended to create separately punishable offenses." *Id.* at 13, 810 P.2d at 1233.

{13} We begin by examining what "double use" may have occurred in this appeal. We understand Defendant's argument to be that his conviction for CSP II was based on the same injuries used to convict him of the other two offenses.

{14} The pertinent portion of the CSP II instruction stated:

> For you to find the defendant guilty of Criminal Sexual Penetration as charged in Count III, the state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
> 1. The defendant, Joseph Traeger, caused Martha Traeger to engage in sexual intercourse;
>
> 2. The defendant, Joseph Traeger, used physical force or physical violence;
>
> 3. *The defendant's acts resulted in any or all of the following injuries; contusions or abrasions to Martha Traeger's neck, broken bones to Martha Traeger's foot or an abrasion to Martha Traeger's vagina[.]*

(Emphasis added.) Defendant asserts that to prove CSP II, the State needed to prove either (a) the injury to Wife's neck, which was the basis of the charge of attempted first-degree murder, or (b) the broken bones in her foot, which were the basis of the charge of aggravated battery with a deadly weapon. He argues that the vaginal abrasion was too minor to constitute the personal injury required to raise third-degree CSP to the charge of second-degree CSP. *See* NMSA 1978, § 30-9-11(D) (1995) (stating that second-degree CSP includes CSP "perpetrated ... by the use of force or coercion that results in personal injury to the victim"); NMSA 1978, § 30-9-10(D) (1993) (defining "personal injury" as "bodily injury to a lesser degree than great bodily harm and includes, but is not limited to, disfigurement, mental anguish, chronic or recurrent pain, pregnancy or disease or injury to a sexual or reproductive organ"). In other words, some of the same conduct may have been used to convict Defendant of more than one offense. His

hitting Wife with the baseball bat not only was the basis for the conviction of aggravated battery with a deadly weapon; it also may have been the conduct found by the jury to establish element "3" of the CSP II charge. Similarly, Defendant's choking Wife with a string may have been not only the basis for the charge of attempted first-degree murder, but also the basis for finding element "3" of the CSP II charge.

{15} Although we agree with Defendant's argument that some of the same conduct may have been used by the jury to convict him of more than one offense, we disagree that Defendant was subjected to double jeopardy. We do so because, even if Defendant is correct in asserting that the abrasion to Wife's vagina was not a sufficient injury to raise the CSP to CSP II, the multiple punishments were authorized by the Legislature.

{16} To determine legislative intent, we make use of certain presumptions. The principal presumption is that the Legislature intended to permit punishment for two different statutory offenses if conviction of each offense requires proof of an element that is not required for proof of the other offense. *See Swafford,* 112 N.M. at 14, 810 P.2d at 1234. This is the test first adopted in *Blockburger v. United States,* 284 U.S. 299, 303-04, 52 S.Ct. 180, 76 L.Ed. 306 (1932). *See Swafford,* 112 N.M. at 8, 810 P.2d at 1228. Our Supreme Court has observed that we should examine the elements of each statutory offense as the offense was charged against the defendant, even though the statute might provide for alternative means of committing the offense. *State v. Carrasco,* 1997–NMSC–047, ¶ 27, 124 N.M. 64, 946 P.2d 1075 ("[W]e focus on the legal theory of the case and disregard any inapplicable statutory elements."). For example, CSP could become CSP II if the victim was a child between 13 and 16 or a prison inmate. *See* § 30-9-11(D)(1), (2). As a result, if one looked only at the statute when applying the *Blockburger* test, one could argue that CSP II contains an element not required for proof of attempted murder, because the age of the victim (or whether the victim is an inmate) is not an element of attempted murder. But as we

understand *Carrasco*, that argument would fail in this case because the CSP II charge against Defendant did not allege that the victim was a child or an inmate. The CSP here was charged as CSP II solely on the ground that it resulted in a "personal injury" to Wife.

{17} Even under the *Carrasco* limitations, however, the charges in this case satisfy the *Blockburger* test. An examination of the elements of the offenses as charged against Defendant shows that the CSP II charge required proof of at least one element not required by the other offenses, and vice versa. The charge of CSP II required proof that Defendant inflicted physical injury on Wife. The jury was instructed that it must find that Wife suffered contusions or abrasions to her neck, broken bones in her foot, or an abrasion to her vagina. But the other two offenses did not require such proof. Actual infliction of physical injury is not an element of attempted first-degree murder. *See* NMSA 1978, §§ 30–2–1 and 30–28–1. As for aggravated battery, one ground for raising battery to aggravated battery is that the battery inflicted great bodily harm. *See* § 30–3–5(A) & (C). Here, however, Defendant was charged with aggravated battery on the ground that he used a deadly weapon. The instruction on that point stated:

> For you to find the defendant guilty of Aggravated Battery with a Deadly Weapon as charged in Count II, the state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
> 1. The defendant, Joseph Traeger, hit Martha Traeger with a baseball bat, an instrument or object which, when used as a weapon, could cause death or very serious injury;
>
> 2. The defendant, Joseph Traeger, intended to injure Martha Traeger;
>
> 3. This happened in Sandoval County, New Mexico on or about the 6th day of July, 1997.

Viewing the offense as charged against Defendant, actual infliction of physical injury was not an element.

{18} Conversely, the other offenses contained elements not required to establish CSP II. To convict Defendant of attempted murder, for example, the jury had to find that he deliberately intended to kill Wife with the cord. To find him guilty of aggravated battery, the jury had to find that he hit her with a deadly weapon. Yet, conviction of CSP II did not require an intent to kill or the use of a deadly weapon. Thus, under the *Blockburger* test, Defendant could be separately punished for CSP II. We therefore presume "that the Legislature intended to separately punish the ... offenses." *Carrasco*, 1997–NMSC–047, ¶ 28, 124 N.M. 64, 946 P.2d 1075.

{19} Finally, we discern no indicia of legislative intent to rebut the *Blockburger* presumption. *See Swafford*, 112 N.M. at 14, 810 P.2d at 1234. We conclude that Defendant's right to freedom from double jeopardy was not violated by punishment for attempted murder, aggravated battery, and CSP II.

### C. False Imprisonment

{20} Defendant contends that there was insufficient evidence to support separate charges for false imprisonment and CSP II. It is true that "[o]rdinarily, almost any act of CSP will involve a restraint or confinement that would constitute false imprisonment." *State v. Corneau*, 109 N.M. 81, 86, 781 P.2d 1159, 1164 (Ct.App.1989). However, in this case, as in *Corneau*, "[e]vidence exists in the record to support a finding by the jury that the underlying felony of false imprisonment was separate and apart from any false imprisonment necessarily involved in almost every act of CSP." *Id.* Wife testified that Defendant would not let her out of the bedroom for a period of time after the CSP occurred. This was sufficient evidence to support a conviction for false imprisonment separate and apart from the false imprisonment that occurred simultaneously with the CSP. *See id.* ("The restraint need be for only a brief time.").

### III. CONCLUSION

{21} We conclude that (1) the jury instructions on aggravated battery with a deadly weapon were improper; (2) Defen-

dant's right to be free from double jeopardy was not violated; and (3) the evidence was sufficient to support the conviction for false imprisonment. We therefore reverse Defendant's conviction and sentence on aggravated battery with a deadly weapon under Issue (1) and affirm the trial court's judgment and sentence on Issues (2) and (3). We remand for a new trial on Issue (1) consistent with this opinion.

{22} **IT IS SO ORDERED.**

WECHSLER and SUTIN, JJ., concur.