2001-NMSC-022

29 P.3d 518

**STATE of New Mexico, Plaintiff–Petitioner,**

v.

**Joseph TRAEGER, Defendant–Respondent.**

No. 26,155.

Supreme Court of New Mexico.

July 31, 2001.

Patricia A. Madrid, Attorney General, Ann M. Harvey, Assistant Attorney General, Santa Fe, NM, for Petitioner.

Phyllis H. Subin, Chief Public Defender, Susan Roth, Assistant Public Defender, Santa Fe, NM, for Respondent.

## OPINION

BACA, Justice.

{1} The Defendant, Joseph Traeger, appeals his conviction for aggravated battery with a deadly weapon contrary to NMSA 1978, § 30–3–5(A), (C) (1969). He was also convicted of numerous other related crimes which are not the subject of this appeal.[1] This Court issued a writ of certiorari to the Court of Appeals to consider the propriety of the jury instructions on aggravated battery with a deadly weapon. *See* NMSA 1978, § 34–5–14(B)(4) (1972) (stating that the Supreme Court has jurisdiction to review by writ of certiorari matters including "issue[s] of substantial public interest that should be determined by the [S]upreme [C]ourt"). Specifically, this Court is asked to consider whether a baseball bat, when used to strike a victim, should be considered a deadly weapon without a jury finding to that effect. The

State argues that a baseball bat is a "bludgeon" within the definition of a deadly weapon found in NMSA 1978, § 30–1–12(B) (1963). According to this reasoning, a baseball bat would be considered a deadly weapon as a matter of law, or per se. This conclusion would remove the issue of whether a baseball bat is a deadly weapon from the jury. The Court of Appeals declined to classify a baseball bat as a deadly weapon per se, and found reversible error in the jury instructions based on the reasoning in *State v. Bonham*, 1998–NMCA–178, 126 N.M. 382, 970 P.2d 154. *State v. Traeger*, 2000–NMCA–015, ¶¶ 9–11, 128 N.M. 668, 997 P.2d 142, *cert. granted*, 128 N.M. 690, 997 P.2d 822 (2000). We also decline to hold that a baseball bat is a deadly weapon as a matter of law; however, we reverse the Court of Appeals' opinion based on its application of the reversible error standard in this case. We find that because the Defendant did not preserve the error in the jury instructions, a fundamental error standard applies. We hold that the error in the jury instructions given in this case does not rise to the level of fundamental error, and therefore we affirm the Defendant's conviction for aggravated battery with a deadly weapon.

### I.

{2} The Defendant and his wife, the victim,[2] separated in February of 1997. After spending some time in Illinois, the victim moved back to New Mexico, but remained separated from the Defendant. On July 7, 1997, the victim went to the Defendant's trailer to pick up some money and some papers. She only planned to stay a few minutes. After the Defendant asked the victim about her plans for their marriage, she responded that she still intended to get a divorce. The Defendant then gave her an envelope, and told her that he would walk

---

1. The Defendant was also convicted of the following: attempted first degree murder contrary to NMSA 1978, § 30–2–1 (1994) and NMSA 1978, § 30–28–1 (1963); criminal sexual penetration contrary to NMSA 1978, § 30–9–11 (1995); and false imprisonment contrary to NMSA 1978, § 30–4–3 (1963). These convictions were affirmed by the Court of Appeals in *State v. Traeger*, 2000–NMCA–015, ¶ 21, 128 N.M.

668, 997 P.2d 142, *cert. granted*, 128 N.M. 690, 997 P.2d 822 (2000).

2. Although the victim's name has previously been revealed, we choose to refer to her as "the victim" in an effort to respect her "dignity and privacy throughout the criminal justice process." N.M. Const. art. II, § 24(A)(1).

her out. The Defendant went into his bedroom while she went to the front door.

{3} Returning from his bedroom, the Defendant suddenly attacked the victim. He was now wearing black gloves, and he grabbed her by the neck and covered her face and nose. After struggling at the front door, the Defendant dragged her into his bedroom, where he wrapped a string around her neck, making it difficult for her to breathe. In an effort to breathe, the victim tried to get her fingers between the string and her neck, causing defensive wounds around her neck. During the encounter, the Defendant said, "Did you really think I was going to let you go? Did you really think you were going to get a divorce? ... How stupid are you?"

{4} Eventually the Defendant released the string around the victim's neck, and then he grabbed a wooden baseball bat. Holding the baseball bat up, he ordered the victim to remove her clothes. Attempting to placate the Defendant, she told him "wait," "hold-on," "we'll talk," and "let's just talk." This further angered the Defendant and using the baseball bat, he hit her foot like he was hitting a ball. Her foot swelled immediately and she stated, "I freaked out ... I couldn't stand on it at all." The Defendant continued yelling and calling her a "liar," and stated, "you're not getting out of this room, and you're not going to get out alive." She understood this to mean that the Defendant intended to kill her.

{5} Despite all of the victim's attempts to placate the Defendant, he again demanded that she remove her clothes and he threatened with the baseball bat that, "next it's going to be your head." She then complied by removing her clothes. Although the victim told the Defendant that she did not want to have intercourse, the Defendant forced himself on her and that conduct resulted in his conviction for criminal sexual penetration.

{6} Following the incident, the victim convinced the Defendant to take her to a hospital. Once alone at the hospital, she described the events that led to the injury to her foot to the attending physician, a nurse, and a police officer. At trial, the victim described her injured foot as "shattered" and

testified that it had swelled to approximately five times its normal size. She also said that it was broken in five places.

{7} In addition to other crimes, the Defendant was charged with aggravated battery with a deadly weapon. This charge was based on the Defendant's alleged use of the baseball bat in causing injury to the victim's foot. At the close of the evidence at trial, the jury was given two instructions with respect to this aggravated battery charge. First, the jury was given an instruction on the elements of aggravated battery:

> For you to find the defendant guilty of Aggravated Battery with a Deadly Weapon as charged in Count II, the state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
> 1. The defendant, Joseph Traeger, hit [the victim] with a baseball bat, *an instrument or object which, when used as a weapon, could cause death or very serious injury;*
>
> 2. The defendant, Joseph Traeger, intended to injure [the victim];
>
> 3. This happened in Sandoval County, New Mexico on or about the 6th day of July, 1997.

(Emphasis added.). Second, the jury was instructed on the definition of "deadly weapon" which stated, "A 'deadly weapon' includes bludgeons and any instrument which, when used as a weapon, could cause very serious injury or any weapon which is capable of producing death or great bodily harm." The Defendant did not object to these instructions. After deliberation, the jury convicted the Defendant of aggravated battery with a deadly weapon, contrary to Section 30–3–5.

{8} The Defendant appealed his conviction to the Court of Appeals, arguing that the jury instruction on aggravated battery with a deadly weapon was improper. *Traeger*, 2000–NMCA–015, ¶ 1, 128 N.M. 668, 997 P.2d 142. The Court of Appeals declined to hold that a baseball bat was a deadly weapon as a matter of law. *Id.* ¶ 11, 997 P.2d 142. Instead, the court stated that "the question of whether a baseball bat was a deadly weapon

should have been left to the jury." *Id.* The court analogized the elements instruction given in this case with the instruction given in *Bonham*, 1998–NMCA–178, ¶ 26, 126 N.M. 382, 970 P.2d 154, which addressed a similar issue under a reversible error standard. *Traeger*, 2000–NMCA–015, ¶¶ 10–11, 128 N.M. 668, 997 P.2d 142. In *Bonham*, the Court of Appeals addressed whether the defendant's conviction for aggravated battery with a deadly weapon should be reversed because the jury was not properly instructed on an essential element of the offense. 126 N.M. 382, 970 P.2d 154, 1998–NMCA–178, ¶ 25. The instruction in *Bonham* read in pertinent part: "The defendant did touch or apply force to [the victim] ... with a hot plate or trivet frame, an instrument or object which, when used as a weapon, could cause death or very serious injury." *Id.* ¶ 26, 970 P.2d 154 (emphasis omitted). The Court of Appeals in *Traeger*, concluded that, as in *Bonham*, the grammatical structure of the sentence in the jury instruction improperly took from the jury the decision of whether the baseball bat was a deadly weapon. *Traeger*, 2000–NMCA–015, ¶ 10, 11, 128 N.M. 668, 997 P.2d 142. Therefore, following the precedent set by *Bonham*, the Court of Appeals held that the jury instruction on aggravated battery with a deadly weapon was improper and reversed the Defendant's conviction. *Id.* ¶¶ 1, 21, 970 P.2d 154; *see also Bonham*, 1998–NMCA–178, ¶ 27, 126 N.M. 382, 970 P.2d 154. On appeal to this Court, the State first argues that the Court of Appeals erred in failing to classify a baseball bat as a bludgeon and therefore, a deadly weapon per se. Alternatively, the State argues that even if a baseball bat is not a deadly weapon as a matter of law, the error in the jury instruction did not amount to fundamental error. We address each of these claims in turn.

## II.

■ {9} First, the State argues that a baseball bat is a bludgeon. Since a "bludgeon" is one of the weapons specifically enumerated in Section 30–1–12(B), the State asserts that a baseball bat is a deadly weapon as a matter of law and therefore not a question for the jury. The issue of whether a baseball bat is a deadly weapon per se is purely a question of law. Therefore, we review this issue de novo. *See Churchman v. Dorsey*, 1996–NMSC–033, ¶ 10, 122 N.M. 11, 919 P.2d 1076 ("Questions of law ... are reviewed de novo.") (quoting *Duncan v. Kerby*, 115 N.M. 344, 347–48, 851 P.2d 466, 469–70 (1993)).

■ {10} Aggravated battery is the "unlawful touching or application of force to the person of another with intent to injure that person or another." Section 30–3–5(A). Aggravated battery is elevated to a third degree felony if perpetrated by "inflicting great bodily harm or ... with a deadly weapon or ... in any manner whereby great bodily harm or death can be inflicted." Section 30–3–5(C). In this case, the Defendant's aggravated battery with a deadly weapon conviction is based on his use of the baseball bat to hit the victim's foot. The term "deadly weapon" is broadly defined in Section 30–1–12(B):

> "deadly weapon" means any firearm, whether loaded or unloaded; or any weapon which is capable of producing death or great bodily harm, including but not restricted to any types of daggers, brass knuckles, switchblade knives, bowie knives, poniards, butcher knives, dirk knives and all such weapons with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted, including sword-canes, and any kind of sharp pointed canes, also slingshots, slung shots, *bludgeons*; or any other weapons with which dangerous wounds can be inflicted[.]

(Emphasis added.) The items that are specifically listed in Section 30–1–12(B) are considered "deadly weapons" as a matter of law, or per se. *See, e.g., State v. Conwell*, 36 N.M. 253, 254, 13 P.2d 554, 555 (1932) (considering whether "a certain rock identified at the trial as 3/4ths of an inch thick, 4 inches long, and 3 inches wide" was a deadly weapon). When an individual uses an item that is a deadly weapon as a matter of law, the jury does not consider whether the weapon is a deadly weapon—it is presumed. However, when the item is not specifically listed, it has been the longstanding rule of this State to require a jury finding that the instrument used was a deadly weapon. *See id.* at 255, 13

P.2d at 555. "Where the instrument used is not one declared by the statute to be a deadly weapon, it is ordinarily a question for the jury to determine whether it is so, considering the character of the instrument and the manner of its use." *Id.; accord State v. Mitchell*, 43 N.M. 138, 140, 87 P.2d 432, 433 (1939); *State v. Gonzales*, 85 N.M. 780, 781, 517 P.2d 1306, 1307 (Ct.App.1973).

**{11}** The State argues that a baseball bat fits the definition of "bludgeon" and therefore is a deadly weapon as a matter of law. *See* § 30–1–12(B) (stating a deadly weapon includes "any kind of sharp pointed canes, also slingshots, slung shots, *bludgeons*") (emphasis added). The Court of Appeals decided that a baseball bat was not a bludgeon and not specifically listed in Section 30–1–12(B). *Traeger*, 2000–NMCA–015, ¶ 11, 128 N.M. 668, 997 P.2d 142. We agree with the Court of Appeals' conclusion that a baseball bat should not be classified as a bludgeon, and by extension should not be classified as a deadly weapon as a matter of law. However, we do so based on slightly different reasoning.

{12} In their holding the Court of Appeals stated,

> We believe ... that by including the term bludgeon in the statutory definition, the Legislature used it in its narrow sense—an instrument made for its intended use as a weapon. A baseball bat, on the other hand, is primarily designed to hit a ball, not to be used as a weapon.

*Id.* We agree with the Court of Appeals that we are bound to effectuate the intent of the Legislature, and to that end, we disagree with the notion that the intent of the manufacturer or the primary purpose of the item should have any relevance in this inquiry. Section 30–1–12(B) represents an identification by the Legislature of those items which are so inherently dangerous that it is unnecessary to have a jury determine the "dangerous weapon" element. Stated another way, the Legislature has identified certain items that are so inherently dangerous that the specific facts regarding the weapon and the method of use are irrelevant to a determination of whether the item is a deadly weapon. For example, a "butcher knife" is not primar-

ily designed to be a deadly weapon, but because of the inherent danger when used on a human being, the Legislature has chosen to classify it as a deadly weapon per se. *See* § 30–1–12(B). However, under the Court of Appeals' "intent of the manufacturer" or "primary purpose" test a butcher knife would not qualify as a deadly weapon. This being said, we agree with the Court of Appeals that it effectuates the legislative intent to give Section 30–1–12(B) a narrow construction. *Traeger*, 2000–NMCA–015, ¶ 11, 128 N.M. 668, 997 P.2d 142. Therefore, if the item is specifically listed in Section 30–1–12(B), it is considered a deadly weapon as a matter of law. If the item is not specifically listed, the question of whether the object is a deadly weapon should be given to the jury to decide. In addressing this question, the jury should consider the character of the object and the manner of its use. *See Conwell*, 36 N.M. at 255, 13 P.2d at 555.

**{13}** This view is merely an articulation of the long established rule of *Conwell*, 36 N.M. at 255, 13 P.2d at 555. *Conwell* teaches that when an instrument is not declared by the statute to be a deadly weapon it is a jury question, to be determined by "considering the character of the instrument and the manner of its use." *Id.* In this case, the State argues, "the circumstances surrounding [the] use of the bat ... established the character of the use as in a manner whereby great bodily harm or death can be inflicted within the meaning of [Section 30–3–5]." This argument admits that the specific facts and circumstances of the Defendant's use of the baseball bat are relevant to a determination of whether the bat was used as a deadly weapon. We hold that when the character of the instrument and the manner of its use are necessary to determine whether an item is a deadly weapon, a jury should make that determination.

{14} The State argues that "[i]n modern times, the most common object meeting the dictionary definition of a bludgeon is a baseball bat." The State bolsters this argument by relying on the New Webster's Dictionary definition of a bludgeon as "[a] short, heavy club or weapon, with one end loaded, or thicker and heavier than the other." *See e.g.,*

Webster's Ninth New Collegiate Dictionary 162 (1985). We agree that this definition could be read broadly enough to include a baseball bat; however, this Court is not the entity charged with the modernization of the relevant statute.

{15} If we were to conclude that a baseball bat is a bludgeon as described in Section 30–1–12(B), we would be altering a general definitional statute that has broad applicability to a number of criminal infractions. For example, by altering Section 30–1–12(B), we would be altering NMSA 1978, § 30–7–2 (1985), that prohibits the carrying of a deadly weapon. ("Unlawful carrying of a deadly weapon consists of carrying a concealed loaded firearm or any other type of deadly weapon anywhere.") Section 30–7–2 is a strict liability offense if the item that is being carried is specifically listed as a deadly weapon in Section 30–1–12(B). *See* § 30–7–2. However, if the item is not specifically listed then a jury must first determine if the item is in fact a deadly weapon, and that a defendant "carried the instrument because it could be used as a weapon." *State v. Blea,* 100 N.M. 237, 239, 668 P.2d 1114, 1116 (1983). If we were to conclude that a baseball bat was a deadly weapon as a matter of law, it could be argued that the mere carrying of a baseball bat was prohibited. We believe that to criminalize the carrying of a baseball bat, without a jury finding that the baseball bat was a deadly weapon and that the baseball bat was in fact being carried because it could be used as a weapon, is incongruent with New Mexico law.

{16} In the final analysis, we do not believe that our holding today places an overly onerous burden on the State. The State should first determine if the item that was used is specifically listed in Section 30–1–12(B). If the item is not specifically listed then the question of whether the item is a deadly weapon, given the defendant's use and the character of the item, should be submitted to the jury for a finding of fact. We believe that in most cases the requisite showing that an item was used as a deadly weapon will be shown in the State's case-in-chief while establishing other elements of the crime like intent, motive, method, or the resulting injury. Therefore, we decline to

classify a baseball bat as a bludgeon and therefore a deadly weapon as a matter of law. Instead, we require that a jury determine, given the defendant's use, if the baseball bat was "capable of producing death or great bodily harm." Section 30–1–12(B); *see also* UJI 14–322 NMRA 2001. In this ruling, we retain the firmly established rule that "[w]here the instrument used is not one declared by the statute to be a deadly weapon, it is ordinarily a question for the jury to determine whether it is so, considering the character of the instrument and the manner of its use." *Conwell,* 36 N.M. at 255, 13 P.2d at 555.

### III.

{17} The State next argues that even if a baseball bat is not a deadly weapon as a matter of law, the Court of Appeals erred in applying a reversible error standard when reviewing the propriety of the jury instructions given in this case. The State asserts that a fundamental error analysis should apply, and that the error in the jury instructions did not rise to the level of fundamental error. We agree with the State's contentions, and hold that no fundamental error occurred in this case.

{18} The Court of Appeals issued its opinion in this case on January 4, 2000, and therefore did not have the benefit of our analysis in *State v. Cunningham,* 2000–NMSC–009, ¶ 10, 128 N.M. 711, 998 P.2d 176, which was issued on March 9, 2000. In *Cunningham,* we applied the doctrine of fundamental error to an error in the jury instructions that was not objected to, or raised in the district court. *Id.* Generally, our appellate review is limited to issues that were properly preserved by invoking the trial court's discretion; however, the doctrine of fundamental error provides an exception to our general appellate rules. *See id.; see also* Rule 12–216 NMRA 2001. The doctrine of fundamental error allows an appellate court to review a criminal conviction for errors that "'shock the conscience' or implicate a fundamental unfairness within the system that would undermine judicial integrity if left unchecked." *Cunningham,* 2000–NMSC–009, ¶ 21, 128 N.M. 711, 998 P.2d 176. "The

doctrine of fundamental error is to be resorted to in criminal cases only for the protection of those whose innocence appears indisputably, or open to such question that it would shock the conscience to permit the conviction to stand." *State v. Rodriguez,* 81 N.M. 503, 505, 469 P.2d 148, 150 (1970). This Court, in its discretion, has the inherent power to relieve a defendant when his or her fundamental rights have been violated, even though "he [or she] may be precluded by the terms of a statute or rules of appellate procedure." *Id.* ¶ 12, 469 P.2d 148 (quoting *State v. Garcia,* 19 N.M. 414, 421, 143 P. 1012, 1014–15 (1914)). This Court, however, should " 'exercise this discretion very guardedly, and only where some fundamental right has been invaded, and never in aid of strictly legal, technical, or unsubstantial claims.' " *Id.* In this case, the Defendant did not object, or in any other way raise the error in the aggravated battery with a deadly weapon jury instruction. Therefore, we review for fundamental error.

■ {19} The Court of Appeals decided that the instruction given to the jury in this case was substantially similar to the instruction that was invalidated in *Bonham,* and following that reasoning, held that the error in the instruction amounted to reversible error. *See Traeger,* 2000–NMCA–015, ¶ 9, 128 N.M. 668, 997 P.2d 142; *cf. Bonham,* 126 N.M. 382, 970 P.2d 154, 1998–NMCA–178, ¶ 26. *Bonham* held that the grammatical structure of the instruction formed an "appositive expression" that informed the jury that a trivet was a deadly weapon, instead of requiring that the jury determine the issue. 126 N.M. 382, 970 P.2d 154, 1998–NMCA–178, ¶ 27. The Court of Appeals' opinion in this case applied the same reasoning to a baseball bat. *Traeger,* 2000–NMCA–015, ¶¶ 10, 11, 128 N.M. 668, 997 P.2d 142. In our view, the error in the jury instruction in this case amounts to a "strictly legal" and a highly "technical" objection that the doctrine of fundamental error will not protect. *See Cunningham,* 2000–NMSC–009, ¶ 12, 128 N.M. 711, 998 P.2d 176 (stating that fundamental error will not protect " 'strictly legal, technical, or unsubstantial claims' " (quoting *Garcia,* 19 N.M. at 421, 143 P. at 1014–15)). However, we are not foreclosing the possibili-

ty that in another case, given different facts, a similar instruction could amount to fundamental error. Inherent in fundamental error is the notion that each case must be decided on its own merits. *See State v. Gillihan,* 85 N.M. 514, 516, 514 P.2d 33, 35 (1973) (stating in fundamental error "each case must stand on its own"); *see also Cunningham,* 2000–NMSC–009, ¶ 13, 128 N.M. 711, 998 P.2d 176 (stating that, regarding fundamental error, "[e]ach case will of necessity, under such a rule, stand on its own merits." (internal quotation marks and citation omitted)).

■ {20} The reasoning in *Bonham* was based on the grammatical structure of an isolated elements instruction and revolved around the placement and location of commas. 126 N.M. 382, 970 P.2d 154, 1998–NMCA–178, ¶ 26 ("Thus, the grammatical structure of the sentence informed the jury that the hot plate or trivet was a deadly weapon."). It appears to us that *Bonham* considered the claimed erroneous instruction in isolation without any relation to the other jury instructions. This focused approach is inconsistent with the doctrine of fundamental error. *See Cunningham,* 2000–NMSC–009, ¶ 21, 128 N.M. 711, 998 P.2d 176; *see also* UJI 14–6001 NMRA 2001 ("You must consider these instructions as a whole. You must not pick out one instruction or parts of an instruction and disregard others."). "[C]onsidering the heightened scrutiny of a fundamental error analysis, we hold that in a fundamental error analysis jury instructions should be considered as a whole." *Cunningham,* 2000–NMSC–009, ¶ 21, 128 N.M. 711, 998 P.2d 176.

{21} In this case, when we consider the jury instructions as a whole, we are immediately struck by two instructions that impact our analysis. First, the introductory phrase to the aggravated battery with a deadly weapon instruction instructs the jury that in order to convict the defendant, "the state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime." This introductory phrase requires that the jury instructions be written in the affirmative, and then it is left to the jury to decide if each of the elements

are positively established beyond a reasonable doubt. In this way, the aggravated battery with a deadly weapon instruction is similar to many of our other jury instructions. For example, the first element in a willful and premeditated murder is to establish that, "[t]he defendant killed [the victim]." UJI 14–201 NMRA 2001. This instruction is also stated in the affirmative and can be read as informing a jury that the defendant killed the victim; however, when read together with the introductory phrase, the jury understands that this is an element that they must decide.

{22} The Defendant asserted at oral argument that the following is a legally correct and a preferred instruction:

For you to find the defendant guilty of aggravated battery with a deadly weapon as charged in Count 2, the state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:

1. The defendant, Joseph Traeger, hit [the victim] with a baseball bat.

2. A baseball bat is a deadly weapon.

3. The defendant, Joseph Traeger, intended to injure [the victim].

4. This happened in Sandoval County, New Mexico on or about the 6th day of July, 1997.

This is a preferred instruction not because it does not inform the jury that a baseball bat is a deadly weapon, but because it parses out the two independent elements: (1) that the Defendant hit the victim with a baseball bat; and (2) that a baseball bat is a deadly weapon. If read literally this instruction could not more clearly and unambiguously inform the jury that a baseball bat was a deadly weapon. In our view, the problem with the instruction at issue in this case is not that it informs the jury that a baseball bat is a deadly weapon, but that it is complicated because it combines two independent elements. Unlike the Defendant's proposed instruction, the instruction given to the jury at trial stated, "[t]he defendant ... hit [the victim] with a baseball bat, an instrument or object which, when used as a weapon, could cause death or very serious injury." This instruction requires that the jury first find

the application of force element, "[t]he defendant ... hit [the victim]," and then in the same instruction the jury is instructed to contemplate whether the baseball bat is a deadly weapon. It is the combination of these two elements that has resulted in the awkward phraseology. Despite being awkward, we do not believe that this jury instruction deprived the Defendant of a " 'right which was essential to his defense and which no court could or ought to permit him to waive.' " *Cunningham,* 2000–NMSC–009, ¶ 13, 128 N.M. 711, 998 P.2d 176 (quoting *State v. Garcia,* 46 N.M. 302, 309, 128 P.2d 459, 462 (1942)).

{23} The second relevant instruction clarifies any complication resulting from the combination of the two elements in the aggravated battery instruction given. The second instruction informs the jury of what constitutes a "deadly weapon." "A 'deadly weapon' includes bludgeons and *any instrument which, when used as a weapon, could cause very serious injury or any weapon which is capable of producing death or great bodily harm.*" (Emphasis added.). Given these instructions, in a fundamental error analysis, where the jury instructions are to be read together, we are convinced that the jury considered the issue of whether the Defendant used the baseball bat as a deadly weapon. Therefore, the error in the jury instructions in this case amounts to a highly technical and a strictly legal objection. Given the facts of this case, this highly technical and strictly legal objection does not rise to the level of fundamental error.

{24} Further, according to the Uniform Jury Instruction in effect at the time, a correct instruction would have read, "The defendant, Joseph Traeger, hit [the victim] with an instrument or object which, when used as a weapon, could cause death or very serious injury." *See* UJI 14–322 and use note 3 NMRA 1998 (prior to Jan. 15, 1998 amendment). Therefore, the only difference between the recommended instruction and the one given in the Defendant's case is that the instrument was actually named: the phrase "a baseball bat" was inserted in addition to simply using the phrase "an instrument or object." Although the district court

and practitioners have an obligation "to keep abreast of current changes in the law," *State v. Lopez*, 1996–NMSC–036, ¶ 9 n. 1, 122 N.M. 63, 920 P.2d 1017, the error by the district court in including the phrase "a baseball bat" in addition to the general language "an object or instrument" is understandable given the commonly recognized term to identify the instrument. In our view, it was necessary in this case to specifically name the instrument in the jury instructions because there were two counts of aggravated battery charged; one with the baseball bat and one with the cord. Without specifically naming the instrument, the jury would have been unable to discern which count they were considering. The modified Uniform Jury Instructions, UJI 14–322 NMRA 2001, resolves this ambiguity and practitioners should take special care to use the new Uniform Jury Instructions where applicable.

{25} In the final analysis, the doctrine of fundamental error is derived from a court's " 'inherent power to see that [an individual's] fundamental rights are protected in every case.' " *Cunningham*, 2000–NMSC–009, ¶ 12, 128 N.M. 711, 998 P.2d 176 (quoting *Garcia*, 19 N.M. at 421, 143 P. at 1014–15 (opinion on rehearing)). We are concerned with situations when "guilt is so doubtful that it would shock the judicial conscience to allow the conviction to stand." *Id.* ¶ 13, 998 P.2d 176 (quoting *State v. Baca*, 1997–NMSC–045, ¶ 41, 124 N.M. 55, 946 P.2d 1066). In this case, we are simply not convinced of the Defendant's innocence. Instead, we are convinced that the Defendant intended, and did in fact, use the baseball bat as a deadly weapon. First, the Defendant hit the victim's foot hard enough that the victim described it as "shattered." Then he threatened "next time it's going to be your head." According to the victim, the Defendant also stated "You're not getting out of this room, and you're not going to get out alive." These are clearly deadly threats coupled with an act that inflicted great bodily harm to the victim. The Defendant's comments and actions were designed to inflict pain and induce fear in order to force submission. This goal was in fact achieved, as the Defendant used the baseball bat to force the victim to remove her clothes and to engage in forced sexual inter-

course. Given the Defendant's use of the baseball bat, it does not " 'shock the conscience' or implicate a fundamental unfairness within the system" to affirm the Defendant's conviction. *Id.* ¶ 13.

## IV.

{26} Therefore, we decline to classify a baseball bat as a deadly weapon as a matter of law and instead we retain the rule that if the item is not specifically listed in Section 30–1–12(B), then a jury should make that determination considering the character of the instrument and manner of its use. However, we hold that the error in the jury instructions did not rise to the level of fundamental error, and therefore, the Defendant's conviction for aggravated battery with a deadly weapon is affirmed.

{27} **IT IS SO ORDERED.**

WE CONCUR: PATRICIO M. SERNA, Chief Justice and PETRA JIMENEZ MAES, Justice.

GENE E. FRANCHINI, Justice (specially concurring).

PAMELA B. MINZNER, Justice (specially concurring).

FRANCHINI, Justice. (specially concurring).

{28} I concur in the result but write specially because, unlike the majority, I do not believe the jury instructions were erroneous. Section 30–1–12(B) includes "bludgeons" among its list of objects that are "deadly weapons" as a matter of law. A bludgeon is defined as "[a] short, heavy club or weapon, with one end loaded, or thicker and heavier than the other." New Webster's Dictionary (1981). Thus, when used as a weapon, a baseball bat is a bludgeon by definition. By instructing the jury to determine whether Defendant "hit" the victim with a baseball bat with the intent to injure her, the trial court effectively instructed them to determine whether the baseball bat was used as a weapon. I believe that the difference between this instruction and one that would have asked the jury to determine whether

the baseball bat was a "deadly weapon" is a matter of semantics and does not amount to error. I would affirm Defendant's conviction on that basis.

I CONCUR: PAMELA B. MINZNER, Justice.